IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 06-cv-01231-PSF-CBS

FOREST GUARDIANS;
COLORADO WILD;
CENTER FOR NATIVE ECOSYSTEMS;
CARSON FOREST WATCH;
K. RANDAL McKOWN;
GILBERT DURAN; and
ALICE DURAN,

      Plaintiffs,

v.

U.S. FOREST SERVICE,

      Defendant.
_____

## FINAL ORDER ON PLAINTIFFS' COMPLAINT SEEKING REVIEW OF ADMINISTRATIVE DECISION
_____

This matter comes before the Court on plaintiffs' complaint seeking review of a

final decision issued by Defendant United States Forest Service on or about July 15,

2005.  A final hearing on plaintiffs' claims was conducted by this Court on November

14, 2006.  This Order follows.

## I.    BACKGROUND

Plaintiffs' complaint, filed June 27, 2006 (Dkt. # 1) alleges that the Defendant

United States Forest Service ("USFS") failed to comply with the National Forest

Management Act ("NFMA"), specifically 16 U.S.C. § 1604, the 1982 regulations

promulgated under that Act (the "1982 Regulations"),[1] and the Revised Land and

Resource Management Plan for the Rio Grande National Forest ("Forest Plan"), as well

as the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, when it

approved the County Line logging project for the Rio Grande National Forest located

in southwestern Colorado.  Plaintiffs allege that the County Line logging project is

proposed for approximately 2,282 acres within the Conejos Peak Ranger District of the

Rio Grande National Forest (Complaint at ¶ 37).  Defendant contends that the purpose

of the County Line project is to address a "spruce beetle infestation in a 2,282 acre

area of the Conejos Peak Ranger District in the Rio Grande Forest."  (*see* Notice of

Defendant's Re-solicitation of Bids, Dkt. # 17, at 2).

Plaintiffs further contend more specifically that on August 24, 2001 the Forest

Service issued a draft environmental impact statement ("EIS") on the County Line

logging project for public review and comment.  Plaintiffs submitted comments to the

Forest Service on the draft EIS.  The Forest Service completed a final Environmental

Impact Statement (the "Final EIS") in June 2005 and issued its Record of Decision on

July 18, 2005.  The Forest Service selected Alternative B, now referred to as the

County Line project.  The selected project includes the planned thinning of approxi-

ately 715 acres of spruce-fir forest through removal of healthy, live trees, and

sanitation/salvage harvest of dead and beetle infested Englemann Spruce trees on

approximately 841 acres.  The contemplated action also includes reconstruction of

---

[1]  According to plaintiffs, the 1982 regulations were "formerly codified at 36 C.F.R. part 219 (July 1, 2000 ed.)."  That part of the Code of Federal Regulations currently contains updated regulations as further discussed below.

15.6 miles of roads, realignment of .3 miles of roads, and 2.3 miles of temporary road construction (Complaint at ¶¶ 45-47).

Plaintiff Forest Guardians is a nonprofit corporation with approximately 1,650 members throughout the United States, including Colorado.  Forest Guardians' mission is to protect and restore the natural biological diversity of forests in America's Southwest, including forests in the Rio Grande National Forest.  Members of Forest Guardians engage in outdoor recreation, wildlife viewing, and other activities in the Rio Grande National Forest, including the County Line logging project area, and intend to continue to do so.  It alleges that the health of the Rio Grande National Forest and its native species is an important part of the members' aesthetic and recreational enjoyment of the forest.

Plaintiff Colorado Wild is a Colorado nonprofit corporation with its principal place of business in Durango, Colorado.  Colorado Wild is an environmental conservation organization whose primary interests and goals are the protection and restoration of forested wildlife habitat throughout the southern Rocky Mountains.  Colorado Wild's members continually use the national forests, including the Rio Grande National Forest, the County Line logging project area proper, as well as streams fed by the area, for the purposes of ecological health, recreation, aesthetic enjoyment, and other purposes.  It alleges that those uses and interests are harmed by activities that threaten the integrity of the forested wildlife habitat in the County Line area, such as the proposed logging project.

Plaintiff Center for Native Ecosystems is a nonprofit organization based in Denver, Colorado that works to conserve and recover native and naturally functioning ecosystems in the southern Rocky Mountains and the Upper Rio Grande bioregion. It works with lawmakers and public citizens to preserve natural resources and unfragmented wildlife habitat, and to restore wildlife migration corridors in the Rio Grande National Forest.  Members of Center for Native Ecosystems use and enjoy the County Line logging project area for purposes of ecological health, recreation, aesthetic enjoyment and other purposes.

Plaintiff Carson Forest Watch is a volunteer citizen group based in Penasco, New Mexico that monitors forest management activities on the national forests of northern New Mexico and southern Colorado.  Members of Carson Forest Watch regularly use and enjoy the natural resources of the County Line logging project planning area for nature study, wildlife viewing, photography and outdoor recreation.

Plaintiffs K. Randal McKown, Gilbert Duran and Alice Duran are individuals who own private property adjacent to the area of the proposed logging.  They allege that the value, use and enjoyment of their properties and the surrounding national forest lands will be severely harmed by impacts from the logging on scenic values, wildlife populations, water quality, as well as noise and traffic hazards.

The Intervenors, Intermountain Forest Association ("IFA") and Intermountain Resources LLC ("IR-LLC"), and Mountain Valley Lumber Co., Inc., ("Mountain Valley"), were allowed to intervene as defendants at the hearing held on August 23, 2006. IFA asserts that it "represents sawmills throughout the Rocky Mountains that purchase

4

national forest timber sales." (Motion to Intervene, Dkt. # 4, at 1).  The other two entities are apparently sawmill operators that obtained or are seeking to obtain from USFS the right to harvest or purchase timber from the County Line Project (*id.* at 1-2).

The complaint asserts four claims for relief.  The First, Second and Third Claims for Relief allege violations of the NFMA, the 1982 regulations and the Forest Plan due to:  1) the alleged failure of USFS to collect population data for any of the five MIS (management indicator species) when it prepared the Final EIS  (First Claim); 2) the alleged failure of the USFS to conduct a meaningful assessment of the soils in the project area in considering whether the logging project will violate the soil productivity standards established by the USFS (Second Claim); and, 3) the alleged failure of the USFS to conduct detailed analysis of the impact the logging project will have on stream health and watershed disturbance levels (Third Claim).  The Fourth Claim alleges a violation of NEPA due to the alleged failure of the USFS to discuss and disclose adequately to the public the direct, indirect and cumulative impacts to soil and watershed resources resulting from the logging project.  The complaint seeks a declaration that the USFS violated the above referenced statutes and regulations, and requests injunctive relief causing the rescission of the USFS decision approving the County Line logging project, and directing it to comply with the above referenced statutes and regulations.

## II.      PROCEEDINGS IN THIS CASE

On July 27, 2006, the Forest Service solicited bids for the Wolf Salvage Sale, the first of several contracts that will be awarded "to effectuate" the County Line

Project.  (*See* Defendant's Notice of Resolicitation of Bids, Dkt. # 17, at 2).  On August 8, 2006, all bids that were submitted for the Wolf Salvage Sale were rejected due to issues related to the July 27, 2006 solicitation (*id*.).  On or about August 11, 2006, the Forest Service resolicited bids for the Wolf Salvage Sale (*id*.).  On or about August 21, 2006, the Forest Service identified Intermountain Resources LLC as the apparent high bidder for the Wolf Salvage Sale contract and contract documents were thereafter executed.  (*See* Declaration of Tom Troxel, Dkt. # 29, at 2).

On August 21, 2006, plaintiff filed a motion for temporary restraining order seeking to "suspend" the USFS approval of the project pending a hearing on the plaintiffs' motion for preliminary injunction (Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Dkt. # 21-2, Proposed Order at 1-2).  Plaintiffs' motion for a temporary restraining order came on for a hearing on August 23, 2006. During the course of the hearing the Court recessed and the parties reached a stipulation that was incorporated into a stipulated written order signed by this Court on September 6, 2006 (Dkt. # 37).  The September 6, 2006 Stipulated Order provided a schedule for orderly briefing on the issues, set a hearing on the plaintiffs' motion for preliminary injunction for October 18, 2006, and specified what actions the USFS and intervenors could take prior to that hearing (Dkt # 37 at 2-3).  The September 6, 2006 Stipulated Order at 1 also required the USFS to provide the administrative record of its decision-making proceedings to plaintiffs by September 1, 2006, and a copy was filed with the Court on September 8, 2006 (Dkt. # 40).

The filed Administrative Record ("AR") consists of ten loose leaf volumes of documents constituting the underlying record, the pages of which are bates-stamped consecutively AR 1 to AR 4880. The Court notes that certain pages out of the administrative record are attached separately as exhibits to Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction (Dkt. # 43) ("Plaintiffs' Memorandum"). Because the exhibits from the administrative record bear the same bates-stamped designation as the record filed by USFS, this Order will simply refer to any pages from the administrative record by reference to the "AR" designation without reference to whether or not the page was part of an exhibit to Plaintiffs' Memorandum.

On October 18, 2006, the Court commenced a hearing on plaintiffs' motion for preliminary injunctive relief. The parties made opening statements and plaintiffs called Plaintiff K. Randal McKown as a witness. The Court encouraged counsel during a recess to explore the possibly of resolving the issues that gave rise to the plaintiffs' request for preliminary injunctive relief. Counsel advised the Court following the recess that they had reached a stipulation to resolve the interim issues pending a final decision by this Court. Those stipulations were reduced to writing and filed with the Court and entered as a second Stipulated Order on October 25, 2006 (Dkt. # 62). This second Stipulated Order provides that the Court will hold oral argument on the plaintiffs' claims and the USFS defenses on November 14, 2006, and that the Court will consider the merits of plaintiffs' claims based on existing briefing and the November 14, 2006 oral argument. This Stipulated Order further delineates what road construction may be accomplished during the interim period. Finally, the second Stipulated Order

provides for the filing, pursuant to the parties' agreement, of additional pages of the administrative record that apparently had been withheld from the previously filed record due to the USFS's claims of privilege (*id.* at 3). It further provides that if plaintiffs determine that newly disclosed documents provide support to their claims, they may file a short brief explaining the significance of the newly disclosed documents, and defendants, including the intervenors, may file a brief opposition to such brief.

On October 27, 2006 the Court received nine more loose leaf volumes of documents numbered volumes 11-19, containing numerous pages which the Court will refer to as the supplemental administrative record. The contents of the supplemental record are bates-stamped with page numbers that correspond to the location in the ten volume administrative record where the documents apparently would have been located had all the documents been filed as a single set. For example, the first document in Volume 11 of the supplemental record bears the bates-stamped number 3268 and the document also appears in the ten-volume administrative record with the same bates-stamped number. The following pages in Volume 11 of the supplemental record are bates-stamped numbered 3268.001, 3268.002 *et cetera* through 3268.011. These pages are apparently among those withheld from the original administrative record and from their contents it appears that they were omitted from the document that begins with page 3268. Again, whether or not the documents in the supplemental record are attached as separate exhibits to any filed brief, this Order will simply refer to any pages from the supplemental administrative record by reference to the "AR" designation and the bates-stamped page number without reference to whether or not

the page was part of an exhibit to any filed brief.  The Court has not received any

further briefing in connection with supplemental administrative record.

The Court heard final arguments of counsel on November 14, 2006.  Pursuant

to the second Stipulated Order the Court has considered Plaintiff's Memorandum in

Support of Motion For Preliminary Injunction (Dkt. # 43), the various declarations filed

with the Memorandum (Dkt. ## 44-47) and the exhibits in support of the brief (Dkt.

# 48), all of which were filed on filed September 15, 2006.  The Court has also

considered the Response of Defendant USFS ("Defendant's Response") and the

exhibits thereto (Dkt. # 50), filed September 29, 2006, as well as the Response of

Intervenors and exhibits thereto (Dkt. # 51), and the declaration filed therewith (Dkt.

# 52), all filed on September 29, 2006.  Finally, the Court has considered the Plaintiffs'

Reply Brief and exhibits thereto (Dkt. # 53), filed October 6, 2006, as well as the

additional declarations filed therewith (Dkt. ## 54, 55).

Based on these filings and arguments, the Court makes the following rulings:

## III.     STANDARD OF REVIEW

Although this case has been briefed by the parties in the context of seeking and

opposing the issuance of a preliminary injunction, the discussions in the memoranda

addressing the question of whether plaintiffs have demonstrated a "likelihood of

success on the merits" quite thoroughly set forth the arguments of the parties on the

ultimate questions here.

Plaintiffs concede, as defendant argues, that review of the Forest Service

decision proceeds under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701

*et seq.*, pursuant to which the agency decision may not be set aside unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," citing to 5 U.S.C. § 706(2)(A).  (Plaintiffs' Memorandum at 7-8; Defendant's Response at 20).

Plaintiffs argue that in reaching its determination on this latter issue, the Court "must determine whether the agency 'considered the relevant factors, [and] articulated a rational connection between the facts found and the choice made,'" citing to *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105 (1983) and ultimately must decide if the "agency's conclusion or findings [are] supported by substantial evidence in the administrative record," citing to *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1167 (10th Cir. 1999).

Defendant, citing some of the same authorities, does not appear to take issue with this standard, but in addition urges that the "[a] deferential approach is particularly appropriate where, as here, the challenged decision implicates substantial agency expertise, citing to *Lamb v. Thompson,* 265 F.3d 1038, 1041-42 (10th Cir. 2001) (Defendant's Response at 21), as well as to *Baltimore Gas & Elec. Co. supra*, 462 U.S. at 103 (Defendant's Response at 21, n. 11).  Defendant further argues that "[a]dding to Plaintiffs' burden is the principle that when a federal agency such as the Forest Service interprets its own regulations, its interpretation is afforded special consideration." It cites to *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir. 1993) for the proposition that  "[a]n agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference."  (Defendant's Response at 22).

Defendant further asserts that pursuant to this "highly deferential standard," a federal court may reject an agency's interpretation of its own regulations only when the interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning."  *Id.*  In addition, as stated in *Utah Environmental Congress v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006), a case, like the instant one, involving a determination by the Forest Service to cut pine beetle infested trees, "[d]eference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise."

Plaintiff makes no reply to the defendant's argument that deference to the agency's interpretation of its own regulations is required in this case.

As indicated below, the Court agrees that in the circumstances of this case, deference is required to be to the agency decision, particularly with respect to the issue of what regulations govern the obligations of the USFS with respect to the application of technical and scientific matters with the agency's discretion.

## IV.   ANALYSIS

As noted above, plaintiffs essentially assert three grounds upon which the Record of Decision of the USFS is subject to being found arbitrary and capricious under the Administrative Procedure Act.  First, they argue, the USFS failed to comply with NFMA's requirement of consistency between the Forest Plan and the County Line project, specifically by failing to collect population data for any of the five MIS (management indicator species) in the County Line logging project area before slating the area for one of the state's largest timber harvesting project in the last decade

11

(Plaintiffs' Memorandum at 1, 4 and 26).  Second, they argue that the USFS's claim

that the project will not violate the Forest Plan for soil impacts is not supported by

substantial evidence found in the record and therefore is arbitrary and capricious

(*Id.* at 26).  Third, they argue, the Forest Service violated NEPA procedural duties

to "consider and disclose to the public the cumulative impacts of water resources and

direct impacts to adjacent private lands."  (*Id.*).

## A.    NFMA's Consistency Requirement

Title 16 U.S.C. § 1604(I) essentially requires that contracts for use of National

Forest System lands be consistent with the forest management plans for that particular

forest.  Although plaintiffs' argument as to why the NFMA consistency requirement has

been violated here appears at first to be complex, it really boils down to the following

argument:  Despite having identified five MIS (management indicator species) for

analysis, the Forest Service failed to collect actual population data for all of the five

MIS in the County Line logging project area when it prepared the Final EIS and slated

the area for the timber harvesting.  Such failure to collect actual population data,

plaintiffs assert, is a violation of both the 1982 NFMA regulations and the Forest Plan

(Plaintiffs' Memorandum at 27-31).  This argument, in turn, depends on what MIS

obligations the USFS was subject to at the time this project was finalized by it in

October 2005, and whether the MIS analysis performed here was adequate under

the governing requirements.

### 1.  The Applicable MIS Obligations

Plaintiffs assert, and the USFS does not disagree, that the 1996 version of the Forest Plan for the Rio Grande National Forest lacked provisions complying with the MIS requirements set forth in the 1982 Regulations.  In response to an administrative appeal, the Forest Service corrected this defect and adopted the MIS Plan Amendment in 2003 (Plaintiffs' Memorandum at 29).  The 2003 MIS Plan Amendment, which is found in the Administrative Record at AR 2652-71, is titled "Management Indicator Species: A Forest Plan Amendment."  Thus, plaintiffs assert, projects such as the County Line logging project must comply with the Rio Grande Forest Plan as amended by the 2003 MIS Plan Amendment, and the 1982 Regulations concerning management indicator species (Plaintiff's Memorandum at 29).

Relying on the decision in in *UEC v. Bosworth*, 372 F.3d 1219 (10th Cir. 2004) ("*UEC I*"), plaintiffs assert again that the USFS failed to meet it MIS obligations in connection with the Final EIS for the County Line logging project because it did not collect "actual population data."  They argue that merely documenting the presence of the species, or performing some other type of analysis, does not meet the mandates of the 1982 regulations and does not fulfill the purpose of MIS population monitoring (Plaintiff's Reply Brief at 11-12).  Citing to *UEC I, supra*, plaintiffs argue that the USFS must "gather quantitative data on actual MIS populations" and that the defendant may not forego "population monitoring requirements" merely because it concludes that the project will have "minimal harm."  (*Id.* at 12).

13

It is true, as plaintiffs argue and as defendant concedes, *UEC I* provided two relevant holdings:  1) that the then implemented monitoring requirements contained in 36 C.F.R. § 219.19 applied at the site-specific level, and 2) those regulations required USFS to use "actual quantitative population level data" to meet MIS monitoring requirements under that regulation.  372 F.3d at 1226-27 ("[I]n order to effectuate its MIS monitoring duties under the language of its regulations, the Forest Service must gather quantitative data on actual MIS populations that allows it to estimate the effects of any forest management activities on the animal population trends, and determine the relationship between management activities and population trend changes." (Footnotes omitted.)).

It is also true that *UEC I* found a failure by the USFS to comply with the MIS requirements rendered its decision approving the project at issue there "arbitrary and capricious" even though the use of MIS analysis was but one component of the overall USFS decision.  The Tenth Circuit stated:

> Because we conclude that the Forest Service has
> not complied with its duties under Forest Service regulations
> to monitor several of the relevant management indicator
> species, we conclude that the Forest Service's authorization
> of the Monroe Project was arbitrary and capricious.  We
> **REVERSE** the district court's order affirming the Forest
> Service Record of Decision authorizing the Monroe Project
> and **REMAND** for further proceedings in compliance with
> this ruling."

372 F.3d at 1232.  In reaching this result, Judge Lucero for the circuit panel pointed out that the specific regulation then in effect contained language requiring planning alternatives to be "stated and evaluated in terms of both amount and quality of habitat

14

and of animal population trends of the management indicator species," citing to 36 C.F.R. § 219.19(a)(2), and that 36 C.F.R. § 219.26 provided that to ensure diversity of plant and animals in forest planning, inventories which "include quantitative data making possible the evaluation of diversity in terms of its prior and present condition" shall be taken.  372 F.3d at 1226.

Defendant USFS Service asserts that the 1982 regulations cited by plaintiffs and interpreted in *UEC I* are inapplicable to the County Line project because the 2005 Rules adopted on January 5, 2005 eliminated the MIS concept (Defendant's Response at 39).[2]  Defendant argues that this project became final on October 21, 2005, and therefore the 2005 Rules are applicable.

Citing to the current version of 36 C.F.R. §§ 219.2 and 219.16, defendant asserts that the 2005 Rules effected two changes in the existing regulations that are relevant to this case.  First, USFS argues, the 2005 Rule "focuses on forest-level programmatic planning" (as opposed to project level planning) and "generally does not apply to site-specific projects such as the County Line Project."  Second, USFS argues, the 2005 Rule entirely "abandons the MIS concept." (*id.*).  Although the Court finds no express language in either of the cited regulations stating that the MIS concept has been abandoned, the absence of a reference to MIS may be what the defendant is referencing.

---

[2]   The 2005 Rule referred to by defendant is now codified in the Code of Federal Regulations at least 36 C.F.R. §§ 219.1-219.16.  *See* 70 Federal Register 1023 (Defendant's Response at 12).

Defendant's Response also cites to a comment published in the Federal Register when the final 2005 Rules were announced that states that "[t]he concept of MIS was not included in the 2002 proposed rule and is not in the final [2005] rule, except for the transition provisions at § 219.14, because recent scientific evidence identified flaws in the MIS concept."  70 Fed. Reg. 1023, 1048 (Jan. 5, 2005) (*id.* at 39-40).

Defendant further suggests, citing to a sentence in Plaintiff's Memorandum, that plaintiffs concede that **if** the 1982 Rule is not applicable, the 2005 Rules do away with requirements concerning MIS compliance (*id.* at 42).  In their reply, brief plaintiffs assert that they do not concede that the 2005 regulations are applicable (Plaintiffs' Reply Brief at 9, n.8)

What the plaintiffs actually state in their memorandum is "the recently-promulgated 2005 NFMA regulations do away with the requirements concerning management indicator species" (Plaintiff's Memorandum at 31), but as noted, plaintiffs do not concede that the 2005 Rules apply here.  Instead, they argue that because the MIS Plan Amendment adopted in 2003 specifically provided MIS obligations with respect to the Rio Grande Forest, the 2005 regulation is irrelevant (*id.*).

Thus the first question presented here is whether the 2005 Rules supplanted the use of MIS analysis, or at least the requirement of actual population monitoring. Complicating the question is the fact the 2005 Rules contain the transition provision, acknowledged by the USFS in its brief. That provision provides as follows:

16

> f) Management indicator species.  For units with plans developed, amended, or revised using the provisions of the planning rule in effect prior to November 9, 2000, the Responsible Official may comply with any obligations relating to management indicator species by considering data and analysis relating to habitat unless the plan specifically requires population monitoring or population surveys for the species.  Site-specific monitoring or surveying of a proposed project or activity area is not required, but may be conducted at the discretion of the Responsible Official.

36 C.F.R. § 219.14(f) (2005).

From the plain language of this transitional rule, it would appear that MIS obligations are no longer governed by the 1982 regulations, including at least the requirement of actual population data collection and the site-specific monitoring, found to be mandatory in *UEC I*.  But that does not mean that MIS analysis is completely eliminated.  Rather, the MIS "obligations" may be met "by considering data and analysis relating to habitat" and "[s]ite-specific monitoring or surveying of a proposed project or activity area is not required, but may be conducted at the discretion of the Responsible Official."  *Id*.  The transitional rule also qualifies the above provisions, stating "unless the plan specifically requires population monitoring or population surveys for the species."  *Id*.  The issue thus becomes what the Rio Grande Forest Plan "specifically " requires.

Although plaintiffs seem to concede that the 2005 Rules do away with requirements concerning the MIS (Plaintiff's Memorandum at 31), they nonetheless argue that the 2003 MIS Plan Amendment  to the Rio Grande Forest Plan specifically

"requires" MIS data collection.[3]   Therefore, plaintiffs assert, the qualifying provision of

the 2005 transitional rule governs here.

There is no question, despite what the USFS argues in its memorandum, that it

did not ignore MIS analysis techniques entirely when it prepared the Final EIS for the

County Line project.   The Record of Decision at AR 1576 quotes the transitional

section of the 2005 Rule quoted above, 36 C.F.R. § 219.14, and acknowledges that

"[m]onitoring requirements for management indicator species are included in the

Forest Plan."   The Record of Decision also spells out how the MIS monitoring was

accomplished, and concludes that "Management indicator species surveys have

been completed in the analysis area and the Final EIS contains an effects analysis

that addresses effects to management indicator species habitats and populations.

The analysis of management indicator species for the County Line Vegetation

Management Project is consistent with the Forest Plan and the 2005 planning

regulations." (AR 1576).

These statements constitute an acknowledgment by the USFS that at least some

level of MIS monitoring was required, and was intended to be carried out, in connection

with the evaluation of the County Line project.   Moreover, documents contained in the

administrative record and cited by the plaintiffs reflect the implementation of MIS

monitoring.   *See* "Specialist Report for MIS" at AR 2063-2116. Here, where the Forest

_____

[3]   The 2003 Plan Amendment, which is found in the Administrative Record at AR 2652-71, is titled "Management Indicator Species: A Forest Plan Amendment."  Thus, plaintiffs assert, projects such as the County Line logging project must comply with the Rio Grande Forest Plan as amended by the 2003 MIS Plan Amendment, and therefore the 1982 Regulations concerning management indicator species (Plaintiff's Memorandum at 29).

Plan includes the 2003 MIS Plan Amendment, the USFS must comply with some MIS requirements.

### 2. **Did the USFS Meet its MIS Obligations**?

What the USFS did by way of MIS analysis on the five species identified in the 2003 MIS Plan Amendment is summarized in Defendant's Response.  The summary sets forth the data collected and analysis performed on each of five selected MIS species–brown creeper, hermit thrush, Rio Grande cutthroat trout ("RGCT"), elk and mule deer (*id.* at 52-57), all of which are contained in the "Specialist Report for MIS" found at AR 2063-2116.  Defendant's Response also cites to the Final EIS and the Record of Decision to support its conclusions that the County Line project would have minimal impact on the brown creeper and hermit thrush viability (AR at 1341-1342); that there would be would be no discernable change in the local elk population nor risk to elk viability created by the County Line Project (AR at 2100); nor would there be discernable change in the local mule deer population trends at the DAU level, nor risk to mule deer viability created by the project impacts (AR at 2108).

With respect to the fish, the Final EIS concludes that:

> Activities associated with this alternative [the County Line project] could impact trout habitat, and trout populations, much the same as the no action alternative.  But, with correction of existing problem areas, implementation of the project design criteria, and the restoration efforts, stream health should be impacted for a much shorter period of time and actually show improvement over time when compared to the existing condition.

(AR at 1342-43).

However, the USFS further concluded that: "The implementation of this alternative [the County Line Project] may impact  individuals and habitat for a short time during project implementation, but it is not expected to cause a significant shift in density or biomass or a significant change in population numbers."  (AR at 1343). The defendant thus states that "[t]he data gathered by the Forest Service for the RGCT was sufficient to support the decision to approve the County Line Project." (Defendant's Response at 56).

Based on the Court's review of the information provided in the administrative record it does not appear with respect to each of the five species discussed above that the Final EIS included data on "actual population monitoring or population surveys" as would be required if the standards of *UEC I* were to be strictly applied here.  Indeed, at oral argument on November 14, 2006, counsel for the USFS conceded that the agency did not conduct actual population monitoring or surveys in strict accordance with the standards of *UEC I*.  Accordingly, plaintiff argues, if actual population monitoring or population surveys were not performed in connection with the County Line project, the Final EIS is a failure to comply with the applicable regulations, and therefore resulted in an arbitrary and capricious decision.

But even if the MIS analysis here were not in compliance with the 1982 regulations or the interpretation of them in *UEC I*, that does not appear to be dispositive.  As noted above, the pertinent question is whether the 2003 MIS Plan Amendment "specifically required" actual population monitoring or population surveys for the indicated species, because if it did not the 2005 transitional rule does not

mandate such action.  Or, in other words, does the 2003 MIS Plan Amendment "specifically require population monitoring or population surveys for the species."

Plaintiff's Memorandum does not point to any language in the 2003 MIS Plan Amendment that specifically requires actual population monitoring or population surveys.  Plaintiff's counsel at oral argument on November 14, 2006 conceded that there is no language in the 2003 MIS Plan Amendment that expressly requires such actual population monitoring or population surveys.

Rather, what plaintiffs argue is that the 2003 MIS Plan Amendment implicitly requires population monitoring or population surveys because the Record Decision adopting the 2003 MIS Plan Amendment includes the following statement: "Alternative 2 [the 2003 MIS Plan Amendment] meets the Purpose and Need for the Action by amending the Forest Plan so it meets the legal requirements of 36 C.F.R. 219.19" (AR 2662), and the 2003 MIS Plan Amendment itself contains the following statement: "The primary purpose of the MIS amendment is to assure that species viability is measured and monitored as directed in 36 CFR 219.19." (AR 2683) (Plaintiffs' Memorandum at 29).  Thus, plaintiffs argue, because at the time the 2003 MIS Plan Amendment was adopted 36 C.F.R. § 219.19 required population monitoring via actual data collection, as determined in *UEC I, supra*, by referring to that regulation the 2003 MIS Plan Amendment must have itself intended to require population monitoring by actual data collection.

The Court rejects this argument.  As noted above, the 2005 transitional rule eliminated actual population data counts unless an applicable forest plan "specifically"

21

required them.  Here, plaintiffs concede that the 2003 MIS Plan Amendment did not specifically require such counts, but did so only by a reference to the regulation then appearing at 36 C.F.R. § 219.19, as interpreted in *UEC I.*

The Court notes that in *Utah Environmental Congress v. Bosworth,* 443 F.3d 732, 746-48 (10th Cir. 2006) ("*UEC III*"), the panel found that the failure of the forest plan there to reference specifically 36 C.F.R. § 219.19 indicated that the MIS rules were not mandatory, but that the then applicable 2000 transition rule applied.[4]  Here, plaintiffs suggest that the fact that the 2003 MIS Plan Amendment cited to 36 C.F.R. § 219.19 means that under the rationale of *UEC III* this Court should find that the MIS population count rules contained therein are mandatory here.  The Court declines to accept such argument, for the transition rule in effect here is the 2005 transition rule appearing at 36 C.F.R. § 219.14 (2005) and it contains different language than the 2000 transition rule at issue in *UEC III.*  The 2000 transition rule was supplanted by the promulgation of the 2005 Rules.  This Court must apply the transition rule in effect on the date the final agency decision was made, in this case July 18, 2005.  *See Ecology Center, Inc., v. United States Forest Service, supra,* 451 F.3d at 1190-91.

The plaintiffs also urge this Court to follow the decision of the Ninth Circuit in *Earth Island Institute v. United States Forest Service*, 442 F.3d 1147 (9th Cir. 2006), a case applying the 2005 transitional rule to a timber restoration project in the El Dorado National Forest.  In that decision, the court found that the failure of the

---

[4]  A similar determination was made in *Ecology Center, Inc., v. United States Forest Service*, 451 F.3d 1183, 1190 (10th Cir. 2006).

USFS to conduct population monitoring for the hairy woodpecker and the Williamson's sapsucker, two species listed as MIS species in the relevant forest plan referred to as the "2001 Framework" and a related plan known as the El Dorado National Forest Land and Resource Management Plan (the "LRMP"), constituted a violation to the transitional rule.  442 F.3d at 1175.  However, in making this determination the court found that while the USFS was correct that the forest plan there provided generally for "population monitoring *and/or* habitat analyses," with respect to these two species the plan "expressly requires 'population monitoring' specifically in the form of distribution data." *Id.* (emphasis in original).  Thus it found a conflict with the 2005 transitional rule.  In the instant case, however, this Court does not find such an express requirement of population monitoring in the Rio Grande Forest Plan or the 2003 MIS Plan Amendment.  Therefore the asserted conflict with the 2005 transitional rule is not present here.

Furthermore, as argued by the USFS, even if 36 CFR § 219.19 as interpreted in *UEC I* was in effect in 2003, the 2003 MIS Plan Amendment itself recognized that the regulations regarding MIS species analysis could be could be changed, and if they were changed, the 2003 MIS Plan Amendment would no longer require the analysis.  *See* AR at 2694.  (Defendant's Response at 43-46).  The 2005 Rules effected a change in the MIS analysis requirements as noted above.  It can just as easily be found that the 2003 MIS Plan Amendment contained this provision with the intent to incorporate any later change in MIS analysis, including therefore the one effected in the 2005 Rules, and once incorporated actual population monitoring or population surveying was no longer required.

Notwithstanding this analysis, the Court finds one troubling aspect to the USFS's argument.  The MIS specialist report dated December 4, 2004 and titled: "Specialist report for MIS," found at  AR 2063-2116, seems to suggest that actual population monitoring or surveys is required, or at least it was the intent of the specialist to perform such surveys.  The specialist writes: "The Forest Service is obligated by the National Forest Management Act's (NFMA) implementing requirements to acquire and analyze population data of its selected MIS."  (AR 2064).

Counsel for the defendant and intervenors argued that the specialist was mistaken as to his understanding of the regulations, or alternatively, while he may have believed population counts were required when he commenced his studies in 2004, the situation changed after the 2005 Rules were adopted in January 2005.  Although neither scenario is necessarily explained in the record, the Court is satisfied that the USFS's interpretation of its own regulation is entitled to deference on this matter. As noted above, "[a]n agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference."  *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir. 1993).  Thus, when a federal agency such as the USFS interprets its own regulations, its interpretation is afforded such consideration that the interpretation may be rejected only if it is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning."  *Id.*  Moreover, the USFS's interpretations of its own regulations should be given "controlling weight unless [they are] plainly erroneous or inconsistent with the regulation[s]."  *Lamb v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001).  A deferential approach is particularly appropriate

here where the challenged decision involves substantial agency expertise regarding its management of the national forests.

Because the 2005 Rules only require actual population counts for MIS species if the forest plan "specifically" requires them, the Court cannot say that the USFS determination that its own regulations and the Rio Grande Forest Plan, as amended by the 2002 MIS Plan Amendment, do not require actual population counts of MIS species, is either unreasonable, plainly erroneous, or inconsistent with the plain meaning of the regulation, such that it should be rejected.  Thus the Court agrees with defendant that once the 2005 Rules became effective, the obligation relating to management indicator species, to the extent it remained in the Rio Grande Forest Plan, could be discharged without actual population monitoring or population surveys.  The analysis performed in the Final EIS otherwise takes into account the effects which the County Line project will likely have on the five MIS and satisfies the transitional rules provision permitting meeting the MIS obligation by considering "data and analysis relating to habitat" and the plaintiffs may even so concede.  Accordingly, the Court finds no inconsistency between the County Line project analysis and the forest plan that violates the consistency requirement of the NFMA.

### B.    Soils Analysis and Watershed Impacts

Plaintiffs argue that the Forest Service failed to meet the NFMA's requirements to protect forest soils and the plan in effect for this forest which requires the Forest Service to "limit the sum of severely burned and detrimentally compacted, eroded, and displaced land to no more than 15% of any land unit."  (Plaintiffs' Memorandum at 36).

The USFS asserts that it has met this standard here, as set forth in the Record of Decision:

> [P]ast harvesting in the preventative thinning units has impacted about 5% of the area.  Since existing skid trails and landings will be reused, the planned treatment is expected to increase this disturbance by only a small amount.  The sanitation/salvage areas have not been previously harvested so there is no disturbance resulting from past activities.  The planned treatments will result in less than 15% ground disturbance.  Soil quality will be maintained by minimizing erosion, compaction, and displacement.

(AR at 1581).  This determination is based on the Final EIS which contains a detailed analysis of the soils resources (AR 1371-81).

The Final EIS concludes, *inter alia*, that the cumulative effect of the project can meet the soils standard by "careful design and location of skid trails, and temporary roads."  AR 1380.  It also provides that "[l]ogging on snow or frozen soils, where necessary, would keep cumulative effects within limits.  Using existing skid trails and would keep impacts localized."  *Id.*  It also points out that "[m]ass movement [of soils] may occur whether the area is harvested or left to stand.  The areas of highest risk posed by mass movement have been removed from any harvest activity, though mass movement is always possible in this environment."  AR 1381.

Notwithstanding that the USFS's conclusion appears to meet the forest standard, and the reliance on the Final EIS, plaintiffs argue there is not sufficient evidence in the record to support the conclusion because the defendant did not conduct actual soil tests and analysis, but rather relied on "mapping done in areas directly west of the

26

analysis area," an approach rejected in two Ninth Circuit cases as failing to provide substantial evidence to support a conclusion (Plaintiffs' Memorandum at 37-38, citing to *Ecology Center, Inc. v. Austin,* 430 F.3d 1057, 1070 (9th Cir. 2005) ("the purpose of the [soil requirement] is to ensure compliance with the substantive mandates of NFMA") and *Lands Council v. Powell,* 395 F.3d 1019 (9th Cir. 2005).  At oral argument on November 14, 2006, plaintiffs' counsel elaborated on this argument stating that the USFS did not look at the impact on soils in the "individual cutting units," relied on historical data and evidence from areas not even within the County Line project area, or relied on non-analytical field reports as opposed to actual soils samples.

Defendant responds that even if the Ninth Circuit cases were controlling here, it conducted adequate "on site" investigation and soils analysis to met the required standard (Defendant's Response at 58-63).  At oral argument on November 14, 2006, defendant's counsel cited to various reports performed by its soils analysts, including specifically reports prepared by John Rawinski and Michael Burke, which are also referenced in Defendant's Response at 58-60, as well as the data collected by them and relied upon by the USFS.  Defendant argues that these reports and analyses supply the substantial evidence that supports the conclusion reached by the USFS that the soils standard is met here.

Plaintiffs stated at oral argument that the entire body of soils data collected by defendant, and the complete soils analysis performed by the USFS, were compiled by plaintiffs and attached as Exhibit 3 to Plaintiffs' Reply Brief, which consists of some 28 pages of notes, diagrams and photographs.  The Court has reviewed Exhibit 3, which

27

contains the pages from the administrative record at AR 2168-95, and finds that these pages correspond with the references provided by the defendant as the basis for the conclusions in the Final EIS and the Record of Decision.

Defendant's Response explains how these documents relate to and support the findings made in the Final EIS and adopted in the Record of Decision.  The Court will not restate the lengthy explanation contained in Defendants' Response at 58-60, but does find that this data supplies the substantial evidence required to support the conclusion that the agency here examined the relevant data, articulated a rational connection between the facts found and the decision made, and did not make a clear error of judgment.  *See Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002).  Most significantly, the Court finds that the administrative record demonstrates that the decision to go forward with the County Line project was not an arbitrary and capricious one, made in disregard of soil impacts.

Without detailing all the evidence contained in the administrative record, among the matters that are found therein that influence this Court's decision is a memorandum prepared by Michael Burke, a geotechnical engineer, dated June 14, 2005 (AR 2180-82).  The report relates that Burke did onsite field inspections of the proposed County Line Timber Sale on October 11, 2003, and took photographs of the field evidence upon which his interpretations were based.  *See* AR 2180.  Mr. Burke's report candidly explains that based on those field observations, and based on further analysis he did using aerial photographs reflecting changing slope conditions over time, he concluded that there were two areas within the then proposed project area, referred to as North

28

Exclusion Area and South Exclusion Area, where he found the risk of slope movement resulting from timber harvesting to be substantial (AR 2181).  Because of these observations, the Final EIS notes that both of these areas, as well as a third identified as Wet Forested Slopes, "were designed to be excluded from timber harvest" in the final specification of the County Line project (AR 1374).  The Record of Decision also notes that the areas were evaluated to determine whether salvage logging could be accomplished without unacceptable risks to the soils resource, and that unsuitable soils prone to mass movement were excluded from the proposal (AR 1579).  The Court also notes that soils were sampled in the project area on June 10, 2004 (AR 2168) and an erosion analysis was performed as  contained in a report dated March 7, 2005, updated April 24, 2005 (AR 2190-95).

Thus, even if this Court were to follow the reasoning of the Ninth Circuit as expressed in the above cited cases, it would conclude that here there was sufficient evidence in the administrative record here, based on visits to the site of the County Line project, to support the soils conclusions reached by the USFS, and to render the decision to proceed with this project not subject to being overturned as arbitrary and capricious.

### C.   Plaintiffs' Claims under NEPA

Plaintiffs assert that under NEPA a federal agency is required to consider and disclose all direct, indirect and cumulative impacts of its actions citing to 42 U.S.C. § 4332(2) (Plaintiffs' Brief at 41).  Plaintiff asserts the Forest Service failed this duty in two respects: 1)  The USFS violated its duty to evaluate and disclose indirect and

29

cumulative impacts to water resources from livestock grazing, and 2) it ignored impacts to adjacent private landowners from the project (*id.* at 41-45).

Defendant responds, logically, that because the environmental analysis was focused on the treatment of spruce in response to spruce beetle infestation, grazing management was outside the scope of the analysis (Defendant's Response at 64), but, nonetheless, it took into consideration the impact on grazing concluding  "there will be no cumulative effects to range management with in the County Line Analysis Area." (*Id.*, citing to AR 1413).

In their Reply Brief, and at oral argument, plaintiffs argued that the above comments may address "grazing management" but do not address the impact which will result from the movement of livestock into the area after the trees are cut (Plaintiffs' Reply at 16).  The defendant responded at oral argument, as well as in its Response, that the Final EIS does consider this aspect as it provides that cattle will be excluded from the areas where the trees are cut by being fenced out (AR 1412).  Plaintiffs reply that there is no requirement contained in the administrative record "to build fences around each logged area." (Plaintiff's Reply at 16).  It may be that not every detail of the plans are recorded in the administrative record but the Court accepts the representation of the USFS as set forth in the Final EIS that cattle will be fenced out of this area.

In response to the second argument, defendant summarizes the section of its environmental impact statement that considered the effect on adjacent landowners stating that:

> The Forest Service recognizes that "[t]he contrast between private lands and public lands has impacted the landscape . . . . However, the drastic change in appearance between the public and private land can be softened or mitigated by employing harvesting techniques that would allow for a better scenic appearance from critical viewing angles." (AR at 1353-54.) The County Line Project has been designed to retain "adequate reserve trees and snags to minimize changes to the current character of the landscape." (AR at 1355.) In the area of sanitation/salvage, where the spruce beetle infestation is greatest, a minimum of 38 large live or dead trees per acre will remain. (AR at 1356.) By leaving these trees, the texture and color of the landscape will allow for transition between the harvested area and the surrounding forest. (AR at 1356.) In the area designated for thinning, the harvesting "is expected to have minimal effects on the scenic resources because of the topography . . . of the area. (AR at 1357).

Defendant's Response at 66-67. This, it does not appear that the Final EIS ignored the impacts on adjacent lands.

Both in their brief and at oral argument plaintiffs urged that notwithstanding the above conclusions, the Final EIS did not take into account the impact which truck traffic resulting from the logging will have on the adjacent landowners (Plaintiffs' Memorandum at 44). Defendant and intervenors respond that the USFS did perform a roads analysis report (AR 1870-1910) that does discuss the impact that building of logging roads will have on the environment, as well as an analysis which the roads will have on the watersheds (AR 1929-1936). The Court notes that while the roads analysis report does discuss some effects that the logging roads may have on the public, including increasing public access to the forest for purposes of gathering firewood, accessing camping sites and the ski yurt located in the forest, as well as increasing the

opportunities for hunting (AR 1878; 1899-1902), the Court does not find any specific discussion of the effects which logging truck traffic may have on the adjacent private landowners.

However, the roads analysis does acknowledge that there are private land holdings adjacent to the project area, only a few of which have houses located on them. (AR 1905).  Furthermore, the record reflect that the existing roads have been used for logging in the past (*id.*) and Plaintiff McKown testified that his own land had been subject to a logging contract when he acquired it.  He also acknowledged that neither he, nor the Duran plaintiffs, have permanent dwellings on their adjacent private lands and they access the land only occasionally, although regularly, for recreational purposes. The Court also notes that the parties have stated on the record that no logging is expected to occur during the winter months, from approximately mid-December through mid-April.  Given these facts, it appears that the disturbances alleged to be caused by logging truck traffic are mitigated by the non-permanence of plaintiff's dwellings for camping and skiing, and the fact that there is no logging during lengthy parts of the year.  Moreover, the record reflects that plaintiffs and others certainly called their concerns over truck traffic to the attention of the USFS (*see* AR 603, 616, 627, 726), and thus those concerns presumably were considered before the final decision was rendered.  Nothing affirmatively stated in the record suggests by implication that the obvious truck traffic issue was ignored or overlooked.

It is not necessary that the USFS satisfy every possible concern that may be raised about the project, provided that it considered and weighed the concerns as

32

appears to have been the case here.  NEPA requires only that a federal agency consider "significant aspect[s] of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, *supra*, 462 U.S. at 97.  NEPA does not contain substantive environmental standards but instead establishes procedural requirements designed to ensure that agencies take a "hard look" at the environmental consequences of their actions. *Id.*  Moreover, the statute does not require that the agency discuss the relevant environmental impacts in great detail, or use a particular method of analysis in its study.  Rather, it must perform a reasoned evaluation of the relevant factors, and exercise its discretion in an informed manner.  *Utah Shared Access Alliance v. United States Forest Service,* 288 F.3d 1205, 1212-13 (10th Cir. 2002).  In deciding whether claimed deficiencies in a Final EIS are merely "flyspecks," or are significant enough to defeat the goals of informed decision making and informed public comment courts apply a rule of reason standard, or essentially an abuse of discretion, standard. *Ecology Center v. U.S. Forest Service*, *supra*, 451 F.3d at 1189-90.

Here, the "hard look" requirement was satisfied through the Final EIS and the Court is satisfied that the agency's exercise of discretion was truly informed, and did not act in an arbitrary and capricious manner with respect to the issue of truck traffic.

**CONCLUSION**

For the reasons set forth above, the Court DENIES plaintiffs' request for a declaration that the USFS violated NFMA and NEPA by making an arbitrary and

capricious decision in approving the County Line project, and DENIES plaintiffs'

requests for injunctive relief enjoining the USFS to rescind its decision approving the

County Line logging project.  The Clerk of the Court is directed to DISMISS this case

with prejudice.

DATED:  December 6, 2006

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Judge